VIRA J. McLAUGHLIN, ADMX.

*vs.*

BANGOR & AROOSTOOK RAILROAD COMPANY.

Penobscot. Opinion February 29, 1928.

*Fellows & Fellows*, for plaintiff.
*George E. Thompson,*
*Henry J. Hart,*
*Frank P. Ayer*, for defendant.

Sitting: Wilson, C. J., Philbrook, Barnes, Bassett, Pattangall, JJ.

Barnes, J. At its yard, at Northern Maine Junction, the defendant delivers to the Maine Central Railroad Company many cars of freight in its service as a common carrier of interstate commerce.

For a clear understanding of this case and of the character of risks incidental to the employment of plaintiff's interstate, a description of portions of the yards of the connecting railroads at their junction point seems necessary.

Our investigation is limited to the movement of freight cars, which in great numbers are there daily received and delivered by the defendant to the Maine Central.

As the freight trains arrive from the northern section of the state they are assembled in defendant's receiving yard, there broken up by its switching crews, and all but such as need heavy repairing are coupled in groups of about twenty, each group called a "cut," and pushed, ahead of the switching engine, down the length of defendant's yard to its scales, where the cut is stopped, each car, excepting only such as are loaded with paper, run separately on the scales, weighed and pushed along toward the receiving tracks of the Maine Central, and again coupled as before and delivered on the receiving tracks of the latter road. The last act of carriage by the defendant is this delivery of the cars in cuts of about twenty.

It is well to remember that the modern freight car measures from 36 to 50 feet over all, with a clearance when coupled of three or four feet. They are ponderous vehicles, and the switching engine in use on the day of the accident weighed 60 tons.

The track of the Maine Central begins near the weighing scales of the defendant and soon divides into two tracks that extend eastward for such distance as to hold 64 cars each. The northerly track is known as track 2; the other as track 1.

After defendant delivered cars in the Maine Central receiving yard, there remained for it, jointly with the receiving road, the duty of inspecting and making light repairs, the replacing of missing nuts and screws, and such minor repairing as a man with pinch-

bar and wrench could do. This was done by inspectors and light repair men of the crews of the connecting carriers, generally working in pairs, the inspectors beginning at the easterly end of the delivered cars, working westward, chalking marks on the bodies of such cars as needed attention, and followed by the repair men.

The number of cars delivered daily was so great that commonly both tracks were in use, and for more than a year before the accident the repair men were constantly engaged on these tracks, and in this work only. Plaintiff's intestate was one of the repair men so employed by the defendant, and such had been his employment for "just about a year."

After the cars are weighed and re-coupled, the rear brakeman of the switching crew mounts the most easterly car and "sets" its hand brake, and then moves toward the engine, setting all brakes, until the engine must "make steam" to move its train, and until enough brakes are set to hold the cars stationary when loosed from the engine.

On the morning of the accident, May 23, 1926, the first cut of cars on track 2 was set at its extreme east end, and the switcher returned to receiving yard of defendant to make up and deliver succeeding cuts until the repair track should be filled.

It was the custom of defendant not to couple successive cuts to cars standing on the repair track, but to move them down, under the direction of the rear brakeman, till they approached the standing cars, a space, sometimes of ten feet sometimes much less being left between cuts. Why such space was left is not certain, but the Maine Central, not the defendant, after the repair men had reported the cars in condition to be moved, made up the westbound trains and drew them from the repair track.

On this 23rd of May, between seven and eight o'clock in the morning, plaintiff's intestate and George F. Ellis, a repair man of the Maine Central, with their light tools, and with nuts threaded on wire loops about their necks, began work, the former on track 2 and the latter on track 1, and worked along westward, following the inspectors, independent of each other, and on different strings of cars.

When plaintiff's intestate began work one of the cars stood at the easterly end of the repair track. A second cut was placed while

he repaired certain cars in the first cut, and when the second cut came to a stop its most easterly car stood so that only about a foot and a half separated its coupling knuckle from the coupling knuckle of the most westerly car of the first cut, leaving a comparatively narrow space between them.

When the inspectors were at or near the westerly end of cut 2, and after plaintiff's intestate had made repairs on four cars in cut 1, and had probably finished his work on cut 1, he crossed over to where Ellis was working, on track 1, some time between ten and ten-thirty o'clock, having no occasion to do so, as Ellis testified, other than, "that he wanted conversation with me, asked me what time of day it was and how we were getting along." He had his outfit with him, and such course was in the direction of the tool house where the repair men might leave their tools at the luncheon hour.

After such conversation as the repair men had, plaintiff's intestate left the spot where Ellis was working, and the next that Ellis recalls was hearing the rattling of draw-bars on track 2, as though, in the setting of cut 3, it had been pushed so far as to strike and set in motion the cars of cut 2. This is what had happened, and Ellis, "at the same time" heard a cry from plaintiff's interstate, who was caught between the coupling knuckles of the first and second cuts and instantly killed.

The knuckles did not couple, but were separated about six inches by the crushed torso of the deceased.

No one saw the accident. No repairs were made on either of the meeting cars, and Ogilvie, of the pair of inspectors who marked the cars in cut 1 that morning, testified there was nothing to be done that day on the couplers between cuts 1 and 2, and that deceased "had no right on that coupler, to work."

If he were passing between these cars to return to the northerly side of track 2, he had available the safety appliances furnished to make a reasonably safe passage, and it is in evidence that those appliances were then in good order.

It seems that he was passing through, between the cars, and whether walking on the ground, or stepping on the appliances or draw-bar of the easterly car of cut 2 and shaken off, is not determinable.

It is admitted the suit is brought under the Federal Employers' Liability Act (U. S. Comp. St., sections 8657-8665) and that no question arises here as to compliance with the Safety Appliance Act.

To establish defendant's liability, its negligence must affirmatively appear. There can be no recovery under the federal act, where the circumstances are as here related, in the absence of negligence. The duty of the employer is to see that ordinary care is exercised, that the place where work is to be performed is reasonably safe for the employee. The carrier does not guarantee the safety of the place to work.

*Seaboard Air Line Ry.* v. *Horton*, 233 U. S., 492, 501; *Missouri Pacific Railroad Company* v. *Mary I. Aeby*, U. S., opinion Jan. 3, 1928.

In all engagements in car repairing, on continuous tracks, hourly filled and vacated, there must be a necessary accompaniment of danger, and particularly with respect to movement of the cars.

Conditions and circumstances that threaten danger to the employee, of which he has been warned or instructed, or which are obvious to him, or such as the ordinarily prudent person must expect occasionally to arise, despite due care on the part of his employer, are not without the hazard of the employment.

The federal act does not eliminate the defence of assumption of risk (except where a violation of a federal statute is involved); all of the former effects of this doctrine remain as they were at common law. "The employee assumes, as a risk of his employment, such dangers as are normally and necessarily incident to his occupation, and a workman of mature years, is taken to assume them whether he is aware of their existence or not; but risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care. They are the unusual, extraordinary and unexpected acts, and the employee is not to be treated as assuming such risks until he become aware of their existence, unless the act or risk is so obvious that an ordinarily prudent person would have observed and appreciated them."

*Seaboard Air Line Ry.* v. *Horton*, supra.

In this state, "the rule (assumption of risk) prevails, and whenever it is relevant, we must apply it. Dangerous work must be per-

formed; and work must be done in dangerous places; and when a workman makes a contract to do such work, or to work in a dangerous place, he contracts with reference to that danger and assumes the open and obvious risks incident to the work, or as sometimes expressed, such dangers as are normally and necessarily incident to the occupation.

This is a contractual assumption of risk.

With reference to risks and dangers covered by the contract, the employer owes the employee no duty, and so cannot be held guilty of negligence. But there may be a voluntary assumption, by the workman, of risks arising from the failure of the employer to perform his duty, and this occurs when the workman becomes aware of them, or they are so plainly to be seen that he must be presumed to have known and appreciated them." *Morey* v. *Railroad Co.,* 125 Me., 272.

In such case, if negligence of the employer is established, voluntary assumption of the risks arising therefrom must be proved by the defendant.

Defendant, in the case at bar, argues that while the jury found negligence on its part, that body did not give due weight to the testimony which it claims unquestionably proves the assumption of the risk that must be present whenever the force used in adding a cut to the cars on the repair track is sufficient to strike and move, even slightly, the cars to which the cut is added.

Obviously an error in judgment of distance by the rear brakeman, a failure accurately to relay his signal, or an excess of energy released by the driver of the switching engine, or a combination of some or all of these, caused the third cut to strike and push forward the cars of cut 2.

But the defendant urges that such error or omission was a risk incident to the work or obviously likely to be present; that the workman had been instructed as to this risk; and there is evidence that on the morning of the accident this risk was called to his attention, when Ogilvie warned him to "Watch out for George Ellis and himself," or "look out for George Ellis, for you and him is here alone."

It does not seem that there was any act of negligence on the part of co-employees which an experienced repair man should not have

anticipated; the danger from which he should not have appreciated, and if this be true the risk which he assumed by his contract of employment was not changed or increased.

*C. & O. Railroad Co.* v. *De Atley*, 241 U. S., 310.

The employee is held to know and observe the rules which the defendant has promulgated to control in the operation of its road.

What drew plaintiff's intestate from track 2 does not appear, and evidence as to the location of the two repair men when their interview ended is conflicting.

It is undisputed that when coupled cars are hit so as to move them along the track there is a perceptible clicking sound as the "slack" in the draw-bar mechanism is taken up. This clicking sound progresses from the car first hit to the end of the line of cars.

Ellis testifies that the cars of cut 2 gave the clicking sound as they were pushed eastward, and that he heard it just before the accident.

From the evidence it does not seem probable that plaintiff's intestate was stepping on a draw-bar when a shock dislodged him; and, if not, he was stepping into a position of serious danger when he thrust his body between the grim knuckles of loaded freight cars, in an aperture as narrow as that here described.

Further, if he were mindfully going about his work, with eyes and ears open and attuned to indicia of danger, he must have heard the clicking of the draw-bars, and the more clearly if he were walking from the west.

It would seem he must have known that contact might be made at any time between cars on the repair track. An ordinarily prudent man would have had such knowledge. And this is the test.

If he had that knowledge, and he is chargeable with having it, he assumed the risk of danger to himself from such contact.

Granted that disputed questions of fact are within the province of a jury; where a stated group of facts prove a defense the party defendant is entitled to it.

In this case the jury must have drawn untenable inferences from the testimony, or wilfully or carelessly departed from the rules of law given them by the Court.

The facts prove the unfortunate accident to have been a mis-

chance under voluntary assumption of risk, rather than in contributory negligence of plaintiff's intestate.

*Motion granted.*
*New trial ordered.*